Ruffin, C. J.
 

 It is a principle of Equity, which is found in almost every text writer, and has been stated by many judges as undoubted law, that conveyance^ by a woman previous to her marriage, in fraud of the rights, with which the law would invest the husband upon the marriage, must be set aside. It seems agreed by all, that such conveyances are not invalidated upon any ground of policy, merely; for, if that were so, it would apply as well in a Court óf Law, as in Equity, and we have held, in a suit at law between these very parties,
 
 Logan
 
 v. Simmons, 1 Dev. & Bat. 13, that the deed binds the husband at law, because it binds the wife. In so holding, we were supported by the unvaried current of precedents, and the clear declarations of the eminent Judges, Mr. Justice Duller, and Lord Ti-iurlow, who gave opinions in the case of
 
 Strathmore
 
 v. Bowes, 2 Bro. C. C. 345. 1 Ves. jr. 22. If avoided at all, then, it must be on the ground of fraud. Consequently, the conveyanceof a woman before her marriage is not only good at law, but it is
 
 primal facie
 
 good also in Equity, as fraud is never imputed without' evidence. The question is in such cases, what constitutes the fraud : what design' will be fraudulent, and what is evidence of such design ? The law, says Lord Thurlow in the case cited, conveys the marital rights to the husband, because it charges him with all the burdens; which are the con
 
 *495
 
 sideration which he pays ior them; and therefore they are rights on which a fraud may be committed. Out of that right arises a rule of law, that the husband shall not be cheated, on account of his consideration. Now, the rights, thus spoken of; are not present rights, that is, existing at the time of the conveyance; fo'r, a fraud on rights of that kind, the common law would redress. They are prospective rights — those that' the husband expects to enjoy upon the contemplated marriage by the law of the land. A husband, being bound to pay his wife’s debts and to maintain her during coverture, and being chargeable by the law with the support of the issue of the marriage, and bound by the ties of natural affection also to make provision for the issue, it is in the nature of things, as a matter of common discretion, that a woman’s apparent pro-t perty should enter materially, if not essentially, into his inducements for contracting the marriage, and incurring those onerous obligations. It is also to be assumed by a man proposing this relation to a woman, that she too has a view their means of livelihood after marriage, and feels an interest! in the provision that, between their joint stocks, can be made! for a family. Every woman therefore must suppose, that the! man, who is about to marry her, expects she will not put away her fortune, at least the visible part part of it, and thereby diminish his ability to discharge his duties and legal obligations to herself, her creditors, and her future family. And if she, after allowing him to form such expectations, deliberately defeats them by a conveyance of her property, and draws him into the marriage by a deception on that point, it would seem, that it could be nothing less than a fraud on the husband. He is disappointed of what the law promised him, and of what she held out to him, he would get. In such a case it may be well argued, that a concealment of the conveyance would amount to the fraud, upon the principle of
 
 swppres'sio veri
 
 being in bad faith, when a person, towards whom it is practised, has an interest in knowing the truth, and has no ground to suspect any thing that has not been avowed. A very respectable writer, Mr. Roper, in his treatise on Husband and
 

 
 *496
 
 Wife, 1 Vol. 163, entertains the opinion,
 
 that any
 
 disposition' by the wife, made after the .courtship began, without the intended husband’s knowledge and concurrence, is within the ¡^¡schief an¿ the principle laid down by the courts. And' Lord Thurlow uses this language: “If a woman, during the course of a treaty of marriage, make,
 
 without notice
 
 to the intended husband, a conveyance of any part of her property, I should set it aside, though
 
 good prima facie, because affected with that fraud.”
 
 That was said, too, on a rehearing of the case, which had been before heard before Judge' Buller, who had said, that “ fraud, as applied to cases of this nature, is falsely holding out an estate to be unfettered, and that the intended husband will, as such, be entitled to it, when in fact it is disposed of from him; but I do not think there is any case which says, that such a conveyance shall be Void, merely because the wife did not disclose it to the husband.” Concluding with saying, “ therefore it is necessary to shew other facts, and that the husband is actually deceived and misled.” It seems also very clear, that in 'the modern case of
 
 St. George
 
 v.
 
 Wake,
 
 1 Coop. Sel. Ca. 129, Lord' Brougham leans to the opinion expressed by Mr. Justice Buller, though that casé did not require him so to hold. On the other hand, LokD Thurlow again said in
 
 Ball v. Montgomery,
 
 2 Ves. jr. 194, that he “ would set aside a deed, as in fraud of the marriage, if
 
 concealed
 
 from the intended' husband; for if a woman, previously to marriage, conveys' her property
 
 without the privity of the
 
 intended husband, it will be a fraud.” And the case of
 
 Goddard
 
 v. Snow, 1 Russel, 485, decides, that when a woman assigned a sum of money, which the intended husband did hot know she was entitied to, and concealed from him both her right to the money. and her settlement of it, the deed was void. It appears, therefore, that it is a poiiit yet open, and on which respectable opinions are much divided-, whether concealment by the wife, merely, where there is no active expedient adopted to keep the intended husband in ignorance, and where he makes no in-1 quiry, is,
 
 per
 
 se, a fraud. We do-not purpose to give any'’
 
 *497
 
 judgment of this court on if, because we do not think the present case requires us to do so, and we think it safest not to go out of the case into a field of doubtful disputation. We may say this, however, because, though not essential to the decision, it has some bearing on it. That much, we should suppose, might depend, among other things, upon the species of property, as being visible, or not, such as debts, money or stocks, and, if the former, whether it was in the actual possession of the woman, since the possession of tangible property is in itself a sign held out of ownership, and, if continued up to the time of the marriage, is calculated in the nature of a false token to deceive and mislead. The effect of conceal-1 ment may, moreover, be allowed to be more stringent in country than in England ; because there it is the general habit of society to have settlements on marriages, in which professional persons are employed; and that almost necessarily leads to inquiries into the particulars of the fortunes on both sides, and each one, therefore, is to be presumed to have no other expectation, than what is secured in the settlement. But here settlements are very rare, and never are made by persons in the condition of life of the parties here; because our people look to the law as establishing their relative rights and duties upon a proper basis, and do not therefore make those minute inquiries, which would be necessary to the framing of a settlement, but the intended husband expects to get all the wife has — that is, that she will let him get by the marriage all she would keep for herself and within her own power, if she had not contracted the marriage.
 

 But we have said, that it does not seem to us necessary to determine, whether concealment by itself amounts to -fraud in cases of this kind. We say so, because we think, in the case before us, there is much more than concealment; that the plaintiff was actually deceived and misled as to the wife’s circumstances, and her right to the negroes in question» by a set contrivance and agreed purpose between her and her son. It was essayed in the argument to make out, that the witness, Mr. Curry, proved, that the conveyance was communicated
 
 *498
 
 to the plaintiff before the marriage, because the plaintiff said “Yes I did,” in reply to the observation of the witness, “that surely he did not know, that the .negroes belonged to Squire g¿mmons¡ ]3efore he married, because he could not have married for love.” But it is-obvious, that the remark of the witness embraced two distinct points; that of the plaintiff’s knowledge of the state of the title, and that of his motive for marrying; and it does not follow, that the plaintiff meant to affirm both of them. Indeed, the whole reply of the plaintiff shews, that he was confining himself to the latter, and meant by “Yes I did.” to say, that he did marry for love; for he
 
 adds,
 
 “she was a pretty likely woman, and 1 thought we Could do well together,” But a clear refutation of the argument, resting as it does uponan ambiguous phrase of the witness, is the absolute silence of the answer'upon the point. It is no where pretended in it, that the plaintiff was, in the remotest degree, privy to the conveyance. So far from it, the answer clearly implies the contrary, for it says, that the plaintiff’s motive for the marriage was the base one of getting the negroes, at the expense of sacrificing himself in a match with an old woman, for whom he had no affection. And it further says, that one reason why the defendant did not register his deeds was, that he did not wish the plaintiff to know of their existence, for fear he would ill-treat his mother. Besides, the subscribing witness and the son in law, Hunt, both say, that the deeds were kept secret until their registration. There is no doubt, therefore, that the plaintiff was in entire ignorance upon this point at the time of his marriage. He so avers in the bill; and, although he cannot give direct evidence of the truth of á¡ negative averment as to his' own information, yet these are the circumstances he lays before us, and the inability of the defendant to state on his oatheven a belief on the point, much less to give proof of a communication to, or suspicion by the plaintiff, that his wife, who was continuing in poseession of them, had conveyed away the slaves. What opportunity had he to know it? The deed was made on one day, and the marriage took place the next; and the plaintiff did not see his
 
 *499
 
 intended wife, until he went to be married in company with a witness, who has been examined in the cause, and from
 
 1
 
 whom not even an inquiry is made on the subject, though he must have heard of these deeds, if the plaintiff did, at that time. Then, if the'plain tiff was kept in ignorance, was he purposely kept in ignorance, that in that state he might go on and consummate a marriage, which the woman believed he would not contract, if he should be informed of the conveyance? Was that her motive for her conduct, in order that the plaintiff might, under a deception, enter into the marriage? Who can doubt it? Although the plaintiff may have married without affection, and for the base motive of lucre alone, and his subsequent conduct speaks favorably for him in that respect, yet we are obliged to believe, that he would not have proceeded in the marriage, if he had been told wnat was industriously withheld from him on this subject. His opinion of his intended wife’s feelings towards him would have so changed, and the gross imprudence of contracting a marriage, when he had nothing but a trade, and she had conveyed all her property of any value, would have presented itself m so glaring a light, that he must not only have hesitated, but stopped short. That the other parties must have been aware of; and they acted, therefore, in a way effectually to deceive him. The conveyance was executed the day before, lest, if sooner done, it might get wind. It was prepared by we know not whom, and executed in the presence of a single witness, and he illiterate; and, moreover, in order to prevent
 
 Mm
 
 from acting the part of an honest neighbor by the plaintiff, that witness is particularly charged not to disclose it, “ to keep it secret for awhile.” It is said, indeed, that a different reason was given for wishing nothing to be said of the deeds — namely, that it might be kept from the ears of Hunt, a brother in law of the defendant, and not friendly with him. But that is 'a shallow pretence; for what difference could it make to Hunt, whether his wife was cut off by a deed, made to her brother on one day, or by her mother’s marriage with the plaintiff, which was to take place on the next day? The time when these deeds were made
 
 *500
 
 conclusively, that they were made with a direct view *° aPProacfrin? marriage ; and the circumstance, that they include all or nearly all of the property the woman owned, gjjew.g tliey were made, not
 
 bona fide
 
 to advance a child, but to defeat both the marital rights and the
 
 actual expectations
 
 of the intended husband ; expectations, raised upon the possession and enjoyment of the slaves by the wife, as well as upon the common course of women in similar situations, and defeated, not merely by the concealment of the parties, but by their taking means to engage another person to unite in keeping the plaintiff in ignorance. We think such a case clearlyl within the rule, as most strongly expressed by Mr. Justice! Buller. There are other facts besides concealment barely! "The husband has been actually deceived.
 

 It has not been contended^ that a knowledge by the husband, after the marriage, can purge the fraud and set up the deeds; for clearly it could not. A knowledge shewn clearly to exist after the marriage, and acquiescence in any thing done under the deeds, would be evidence to shew a communication before marriage. That is all the effect it could have. But there is nothing of that kind here. Mr. Gurry and Hicks state circumstances, from which we may infer, that the plaintiff had heard, after he married, of some sort of claim of the defendant ; but we have no distinct information on the subject, and it is more than probable that all he went on was what his wife told him, (as mentioned in the answer) when he would threaten to sell some of the negroes, That, it seems, was within two or three years after the marriage; but. it was not calculated to make any impression on the plaintiff, when he discovered that the son, to whom the wife said the negroes belonged, did not claim them, but the plaintiff himself kept them; and Parker states, that he never made known the deeds fo the son and his bailment to his mother, until 1828.
 

 The marriage, though not very fit in point of equality of age, does not appear to have been so unequal, as to give a character of baseness to the plaintiff’s motives; and there is no evidence of his resorting to any deception or unfair means
 
 *501
 
 of gaining the consent of the other parly. It is true, also, that the plaintiff did not settle any thing on the woman, nor' bring an accession to the common stock ; and, therefore, she might have reserved some reasonable share of a considerable estate to her own use, or given it
 
 bona fide
 
 to a child. ■ But it cannot justify such reservation and gift of all the little she had, as this party virtually did, leaving to the husband only the burthen of raising young negroes for the son.
 

 There is nothing whatever, on which the idea, that the plaintiff at any time abandoned his claim, can rest; for he has, though sometimes in a wrong direction, been in hot pursuit of the slaves, ever since the defendant took possession. For the same reason the statutes of limitation do not affect the case, even if they apply to it. As to the short interval between the burning of the court house and the filing of this bill, nothing can be made of it by the defendants; for there was no decree in the former suit, and it may, indeed, be considered, to this purpose, as pending now, and that the present pleadings, made necessary by accident, are but substitutes for those consumed.
 

 The deeds to the defendant, Simmons, must therefore be declared fraudulent, and the plaintiff entitled to the slaves conveyed in them and their subsequent increase; and the defendants be decreed to deliver to the plaintiff the slaves mentioned in the pleadings, and such others as may have been born, as are in their possession respectively, and to account for the hires and profits, and pay the costs of this suit. The defendant, Mr. Graham, having come in under the other defendant, as he did, must, of course, abide by his fate.
 

 Per Curiam, Decreed accordingly.